IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **WALTER AUTO LOAN TRUST;** § <br> **AGORATRADE, LLC;** § <br> **AGORATRADE, LLC as Trust Manager** § <br> **and Beneficiary of the Walter Auto** § <br> **Loan Trust; AGORA DATA, INC., and** § <br> **WALT, LLC** § <br> § <br> **vs.** § <br> § <br> **MANSFIELD FINANCING GROUP, INC.** § <br> **d/b/a CNAC, MANSFIELD AUTO** § <br> **GROUP, INC. d/b/a JD BYRIDER, and** § <br> **RICHARD DOMALESKI,** § <br> **individually.** § | Case No. 4:23-cv-00974-P |

## FIRST AMENDED COMPLAINT

Plaintiffs, Walter Auto Loan Trust, AgoraTrade LLC, AgoraTrade LLC as Trust Manager and Beneficiary of the Walter Auto Loan Trust, Agora Data, Inc. and Walt LLC ("Plaintiffs"), by and through undersigned counsel, file this *First Amended Complaint* against Defendants, Mansfield Financing Group, Inc. d/b/a CNAC and Mansfield Auto Group, Inc. d/b/a JD BYRIDER (together referred to as "CNAC") and Richard Domaleski, individually ("Domaleski") (CNAC, JD BYRIDER and Domaleski being collectively referred to herein as "Defendants"), and allege:

## I.
## PARTIES

1. Agora Data, Inc., is a Delaware corporation with its principal place of business in Arlington, Texas. Agora is the sole member and manager of AgoraTrade, LLC which is the Trust Manager and beneficiary of Walter Auto Loan Trust. Walter Auto Loan Trust is a Delaware trust. AgoraTrade, LLC is a Texas limited liability company with its principal place of business in

Arlington, Texas. Walt, LLC is a Delaware limited liability company. AgoraTrade, LLC is the sole common member and beneficiary of Walt, LLC.

2. Mansfield Financing Group, Inc. is a Massachusetts corporation doing business as CNAC which can be served with process through its registered agent, Business Filings Incorporated, at 9 Capitol Street, Concord, NH, 03301.

3. Mansfield Auto Group, Inc. is a Massachusetts corporation doing business as JD BYRIDER and can be served through its registered agent, Business Filings Incorporated, at 2 1/2 Beacon Street, Concord, NH, 03301 – 4447.

4. Richard Domaleski is an individual who may be served at 782 Gold Street, Manchester, New Hampshire 03103.

## II.
## JURISDICTION & VENUE

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are located in different states and because the amount in controversy exceeds $75,000.00.

6. The Court has personal jurisdiction over Defendants pursuant to the forum-selection clause that the parties agreed to in the at-issue MRA and Personal Guaranty. Specifically, Section 7.7 of the MRA provides that "each of the parties hereto agrees to the exclusive jurisdiction of . . . the State of Texas, located in Tarrant County, and the federal courts located within the Northern District of Texas." In the Personal Guaranty, Domaleski similarly "consent[ed] to the personal jurisdiction of the State of Texas . . . ." The Court also has personal jurisdiction over Defendants pursuant to Texas's long-arm statute because they have done business in Texas by entering into written contracts (the MRA and the Personal Guaranty) that are performable in the State of Texas. Tex. Civ. Prac. & Rem. Code § 17.42. Moreover, and as set

forth herein, Plaintiffs' claims against Defendants arise from Defendants' contacts with the State of Texas, and the exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

7. Venue is proper in this district pursuant to the MRA, which provides that the parties waived any objection to venue in this district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## III.
## RELEVANT FACTUAL BACKGROUND

8. Agora Data, Inc., ("Agora") is a financial technology company that provides independent automobile dealerships and finance companies with loan performance analytics and affordable access to capital.

9. Defendants operate an automobile dealership in New Hampshire. As part of their operations, Defendants provide financing to consumers for the purchase of automobiles. When Defendants' customers purchase vehicles on credit, they execute a retail installment contract ("RIC"), which allows the customer to pay Defendants on a monthly basis until the automobile is fully paid. The RIC additionally makes clear that if the customer defaults under the RIC, the vehicle may be repossessed and sold.

10. Agora, in concert with the other Plaintiffs, offers their partners (dealerships) the option to sell the RICs from their portfolios to Plaintiffs in exchange for a negotiated price. This allows dealerships

11. On January 13, 2022 and September 28, 2022, Plaintiffs and Defendants executed Master Receivables Agreements (the "MRAs"). A redacted copy of the MRA dated

September 28, 2022 is attached as **Exhibit 1**. Under the MRA, Defendants agreed to "sell, transfer, assign, set over and otherwise convey to [Plaintiffs] … all right, title and interest in, to and under" several portfolios of RICs originated through Defendants' "Buy Here Pay Here" program. Domaleski thereafter executed the Personal Guaranty on or around September 30, 2022. Through the Personal Guaranty, Domaleski absolutely and unconditionally guaranteed certain of CNAC's obligations.

12. Pursuant to the MRA, Defendants sold several portfolios of RICs originated by them to Plaintiffs. Once a portfolio of RICs is sold to Plaintiffs, all of Defendants' right, title and interest in, to and under the portfolio is transferred to Plaintiffs as of the "Closing Date" as such term is defined in the MRA.

13. As an express condition of the MRA, each portfolio sold to Plaintiffs would be classified as a "True Sale" for purposes of the Uniform Commercial Code—meaning that at the time of the closing of the purchase, the RICs purchased by Plaintiffs were no longer Defendants' property.

14. Plaintiffs purchased multiple portfolios ("Portfolios") of Receivables from Defendants. Receivables are defined by the MRA as the RICs or Contracts, subject of the MRA purchased by and transferred to Plaintiffs.

15. Shortly after Plaintiffs purchased the foregoing Portfolios, the customers who purchased the vehicles were informed of the sale and assignment of the RICs and were informed where payments should be directed in the future. (The customers are referred to in the MRA as "Obligors").

16. As part of the sale of the Portfolios, Plaintiffs took possession of the original RICs executed by the Obligors which evidence the Receivables. Such originals constitute "tangible

chattel paper" under the Uniform Commercial Code ("UCC"). Plaintiffs' taking possession of the chattel paper perfected the sale as required under the UCC.

17. Plaintiffs own these original RICs and the Receivables.

18. Plaintiffs paid good and valuable monetary consideration to Defendants when they, in good faith, purchased the Receivables from Defendants and took possession of the original RICs representing the Receivables in the ordinary course of Plaintiffs' business.

19. Plaintiffs, through their agent, Westlake Services LLC ("Westlake"), began servicing the RICs that were sold to Plaintiffs.

20. Notice of the transfer in ownership and servicing was sent to the Obligors using the "Form Notice of Transfer" attached as Exhibit C to the MRA.

21. The Notice of Transfer specifies to the Obligors where they would make payments on their RICs going forward. The Notice of Transfer further specifies that the payments were to be made to Westlake.

22. The MRA contains multiple terms, representations, and warranties made by Defendants in favor of Plaintiffs. The most relevant of which are set forth as follows:

**A.    SPECIFIC TERMS, REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MRA.**

23. Pursuant to Section 2.2 of the MRA governing the Purchase Price:

> the parties agree that the related Purchase Price shall be satisfied by (a) Agora (1) remitting or causing its agent to remit the amount required to be delivered to the applicable Prior Lender(s), if any… and (2) (2) in Agora's sole discretion, either (x) remitting or causing its agent to remit to the Deposit Account or (y) netting or causing its agent to net from any amounts otherwise distributable to Originator the sum of any portion of the related Net Advance Remittance, if any, in excess of the amount required to be delivered to the applicable Prior Lender(s), if any, (b) with respect to the related Portfolio sold on the initial Closing Date, transferring the related

> ORI to the Originator and the Originator's acceptance thereof and (c) with respect to the related Portfolio sold on any other Closing Date, by the increase in value of the ORI following the sale and allocation of such Portfolio to the applicable ORI.
>
> With respect to the applicable Closing Date, Agora shall own and be entitled to receive with respect to each purchased Receivable all Collections (whether or not received or recovered) accruing before the related Cut-Off Date if such amounts were not posted to the Receivable prior to the related Cut-Off Date, together with (1) all principal due and owing on the Receivables related to such Portfolio, (2) all Accrued Interest on the Receivables related to such Portfolio; and (3) all other charges or payments due and owing and collections on the Receivables related to such Portfolio, in each case from and after the related Cut-Off Date, a portion of which will be held by Agora for further distribution for the benefit of the Originator in accordance with terms hereof and the documents related to each applicable Financing.

24. Pursuant to Section 2.6 of the MRA:

> [Defendants] acknowledge[] and agree[] that, consistent with Agora's ownership of any Conveyed Property after the related Closing Date, Agora shall have the sole right to service, administer and collect the Conveyed Property and to assign or delegate such right to others, including without limitation, the Portfolio Administrator and the Servicer. Notwithstanding the foregoing, [Defendants] and Agora agree that [Defendants] shall, if instructed or permitted by Agora, maintain "customer service" communications with each Obligor provided, however, that such communications shall not include any attempt by or on behalf of [Defendants] to collect or make demands of such Obligor with respect to the related Receivable unless expressly permitted by Agora.

25. Defendants made multiple representations and warranties regarding the Receivables to Plaintiffs in the MRA. Specifically, under Section 4.2(a) of the MRA, Defendants warranted:

> Each Receivable (A) was originated by [Defendants] or was originated by a third party and purchased by [Defendants], in each case in accordance with [Defendants'] credit policies as of the date of origination or acquisition and in the ordinary course of

[Defendants'] business and, as applicable, was validly assigned, (B) was originated for the retail sale of a Financed Vehicle in the ordinary course of the [Defendants'] business, or third party's ordinary course of business, as applicable, and was fully and properly executed by the parties thereto, and the [Defendants] or third party, as applicable, had all necessary licenses and permits to originate Receivables in the State where such [Defendants] [were] located, (C) contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for realization against the collateral security, and (D) is a Receivable which provides for level monthly payments (provided that the period in the first period and the payment in the final period of the Receivable made by minimally different from the normal period and level payment) which, if made when due, shall fully amortize the Amount Financed over the original term.

26.  Pursuant to Section 4.2(d), Defendants warranted:

Each Receivable represents the genuine, legal, valid and binding payment obligation of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except (A) as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law and (B) as such Receivable may be modified by the application after the Cut-Off Date of the Servicemembers Civil Relief Act, the California Military Families Financial Relief Act or similar legislation; and all parties to each Receivable had full legal capacity to execute and deliver such Receivable and all other documents related thereto and to grant security interest purported to be granted thereby.

27.  Additionally, Section 4.2(j) Defendants warranted:

There is only one original executed copy (or with respect to Electronic Contracts, one Authoritative Copy) of each Contract and there has not ever been any other original or Authoritative Copy of such Receivable.

28.  Pursuant to Section 4.2(o) Defendants warranted:

Each receivable created or shall create a valid, binding and enforceable first priority security interest in favor of the [Defendants] in the Financed Vehicle. The Certificate of Title for

each Financed Vehicle shows, or if a new or replacement Certificate of Title is being applied for with respect to such Financed Vehicle the Certificate of Title will be received within 90 days of the origination of the related Receivable and will show, the [Defendants], or if directed by Agora, such other entity so specified by Agora in its sole discretion named as the original secured party under each Receivable as the holder of a first priority security interest in such Financed Vehicle. With respect to each Receivable for which the Certificate of Title has not yet been returned from the Registrar of Titles, [Defendants] [have]applied for or received written or electronic evidence that such Certificate of Title showing [Defendants] as first lienholder has been applied for and [Defendants'] security interest (assigned by [Defendants] to Agora) has been validly assigned by the [Defendants] to Agora and reflected on the AgoraCapital Platform and immediately upon the transfer and assignment of the Receivables to Agora on the Closing Date, Agora shall have good and marketable title to the Receivables and, free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest or other right or title of any other Person. As of the Cut-Off Date, there were no Liens or claims for taxes, work, labor or materials affecting a Financed Vehicle which are or may be Liens prior to equal to the Liens of the related Receivable.

29. Defendants were required to deliver a Receivable File with the originating documents including the vehicle's title. Specifically, Section 3.3 (c) provides:

> With respect to the acquisition of a Portfolio on the related Closing Date by Agora, [Defendants] shall have, prior to the date that is more than ten (10) Business Days prior to such Closing Date deliver and release to the Servicer (or to such Person as the Portfolio Administrator directs) via overnight delivery the items listed under the related Receivable File with respect to each Receivable sold by [Defendants] to Agora or such Closing Date and set forth on the related Receivables Schedule. If Agora or the Portfolio Administrator identifies any Receivable that does not conform to the information set forth in the related Receivables Schedule, such Receivable shall be rejected for purchase, unless waived by Agora or the Portfolio Administrator in writing. If not purchased by Agora, such Receivable shall be deleted from the related Receivables Schedule. Agora or the Portfolio Administrator each shall not be required to conduct, or have conducted on its behalf, any such examination. The fact that Agora, the Portfolio Administrator or their respective designee(s) have conducted or have determined not to conduct any partial or complete examination of the related

      Receivable Files shall not affect any rights to demand repurchase in accordance with Section 6.4 of this Agreement or any other relief or remedy provided for in this Agreement.

30.     The MRA provides under Section 3.3(d):

      In the event [Defendants] fails to deliver to the Servicer (or such Person as the Portfolio administrator directs), with respect to any particular Receivable, the related Receivable File to the reasonable satisfaction of the Portfolio Administrator and in accordance with this Section, Agora or the Portfolio Administrator shall provide written notice to [Defendants] of such failure. If, after five (5) Business Days from the date of receipt of such notice, [Defendants] fail[] to cure such failure, Agora or the Portfolio Administrator may at its sole option require [Defendants] to repurchase such Receivable. If Agora or the Portfolio Administrator requires [Defendants] to repurchase, [Defendants] shall repurchase such Conveyed Property by paying to Agora the related Repurchase Price in good funds within two (2) Business Days following Agora's or the Portfolio Administrator's notice hereunder. In the event [Defendants are] required to repurchase the applicable Conveyed Receivable hereunder, Agora or the Portfolio Administrator shall cause the Servicer to deliver to [Defendants], following Agora's receipt of payment from the [Defendants] of the related Repurchase Price, the related Receivable File and shall cause the assignment to [Defendants] all of Agora's right, title and interest in and to the related Conveyed Property, free and clear of any and all claims, liens, and encumbrances, except for those which existed at the time of Agora's purchase thereof from [Defendants].

31.     Pursuant to Section 5.1(c), Defendants covenanted:

      To the extent [Defendants] or [Defendants'] Servicer receives any Collections in respect of any Conveyed Property after the related Closing Date, [Defendants] shall deliver, and shall direct [Defendants'] Servicer to deliver, as appropriate, directly to such account or otherwise as Agora or the Portfolio Administrator may designate, within two (2) Business Days after receipt and identification thereof, any and all such Collections in the form so received, and agree[] that all such Collections shall be deemed to be received in trust for Agora and shall be held in trust until such Collections are delivered to the Servicer; provided further [Defendants] or [Defendants'] Servicer shall not comingle such funds prior to delivery to the Servicer hereunder.

### B. DEFENDANTS' POSSESSION OF CUSTOMER PAYMENTS BELONGING TO AGORA

32. As stated above, after the Closing Date and the transfer of the portfolios from Defendants to Plaintiffs, Plaintiffs were "entitled to receive with respect to each purchased Receivable all Collections (whether or not received or recovered)" from the portfolios.

33. Despite these terms, Defendants continued to collect payments from the Obligors.

34. The Defendants are in possession of over $160,406.31 in customer payments.

35. Each payment received by Defendants from the Obligors after the sale of the Portfolios to Plaintiffs must be remitted to Plaintiffs.

36. Although Defendants failed to notify Plaintiffs of receipt of these payments, to date, Defendants have not remitted these payments to Plaintiffs as required under the MRA.

### C. FAILURE TO DELIVER TITLE & FAILURE TO ASSURE VALID FINANCE TRANSACTIONS

37. The MRA requires a valid certificate of title for each vehicle that serves as collateral for the portfolio of RICs that are transferred to Plaintiffs. Ex. 1, § 4.2(o). The MRA further required the certificate of title to identify CNAC or Agora as the First Lienholder for each respective vehicle. In breach of the MRA, Defendants have failed to deliver clear marketable title (e.g. titles that identify CNAC or Agora as the First Lienholder) to the following vehicles:

| Agora Acct # | Originator Acct # | VIN | Buyback Amount |
|---|---|---|---|
| 21950442 | 12582024 | 3FA6P0HD5ER310493 | $16,020.00 |
| 22042420 | 12590990 | JN8AS5MT6CW269111 | $0.00 |
| 20753804 | 12358871 | 5N1AT2MVXGC756789 | $18,953.54 |
| 19990720 | 12262356 | 1YVHZ8BH7B5M16606 | $11,056.04 |
| 22792723 | 12671359 | JTDKN3DU4B0282493 | $13,284.17 |
| 23257914 | 12754264 | 4S4BRDHC7B2310010 | $15,720.00 |
| 23131177 | 12735715 | 5XYKUDA79EG539721 | $16,620.00 |
| 21271937 | 12442729 | KMHDU4AD4AU832767 | $10,235.83 |
| 23175459 | 12745240 | ZACCJBBT0FPB55819 | $17,586.38 |
| 23608430 | 12814578 | ZACCJBBT3GPD53916 | $5,689.85 |
| 22745166 | 12670990 | JN1BY1AR4DM600266 | $18,320.00 |
| 19931987 | 12242936 | 1FAHP3F24CL124466 | $731.38 |
| 23161269 | 12738852 | JN8AS5MT5FW668788 | $8,220.00 |
| 23093543 | 12729572 | 19XFB2F53DE265219 | $15,720.00 |
| | | Total | $168,157.19 |

38.   Defendants were provided with multiple notices of these failures prior to the filing of this lawsuit and Defendants failed to cure these multiple material breaches.

   D.   **FAILURE TO REPURCHASE CERTAIN RECEIVABLES**

39.   Pursuant to Section 6.4 of the MRA, Defendants were required to repurchase certain Receivables (which Defendants requested to re-purchase). Despite the fact that Plaintiffs conveyed these Receivables back to Defendants, Defendants have not paid the re-purchase amounts. A table that reflects the receivables that Defendants failed to re-purchase (e.g., pay for) is set forth below:

| VIN | Agora Acct # | Originator Acct # | Buyback Amount |
|---|---|---|---|
| 1FM5K8D83FGA16557 | 22042426 | 12592701 | $21,420.00 |
| JN8AS5MV5BW289043 | 20364691 | 12315339 | $16,912.19 |
| 1G1PG5SB5F7184656 | 18811952 | 12017971 | $14,659.00 |
| 4T4BF3EK5BR112602 | 18269057 | 11894234 | $13,170.00 |
| JM1BL1UG4C1519791 | 18268984 | 11920607 | $13,020.00 |
| 2C4RC1CG5CR287617 | 18269030 | 11876486 | $12,820.00 |
| JN8AZ1MW3AW111918 | 18269139 | 11815240 | $11,820.00 |
| 2C4RC1CG5CR287617 | 18925418 | 12068689 | $11,520.00 |

| VIN | Agora Acct # | Originator Acct # | Buyback Amount |
|---|---|---|---|
| JM1BK344091205021 | 18268978 | 11919189 | $10,720.00 |
| 1LNHM94R99G621385 | 18266099 | 10712892 | $9,656.51 |
| 3N1AB6AP9BL692846 | 18269468 | 10350604 | $6,637.22 |
| 4S3BMBA68B3232603 | 18264824 | 9693664 | $6,496.66 |
| 3N1AB61E68L627170 | 18266869 | 9620148 | $5,628.72 |
|  |  |  | **$154,480.30** |

40. Pursuant to Section 6.4 of the MRA, Defendants are required to repurchase these Receivables from Plaintiffs.

### E. **FAILURE TO SERVICE CUSTOMER WARRANTIES.**

41. In addition to the foregoing, upon information and belief, Defendants have failed to honor customer vehicle warranties and have instead referred the customer to Plaintiffs and/or their servicer, Westlake. Defendants' refusal to honor the customers' warranties is improper. Sections 2.3 and 6.6 of the MRA expressly state that Plaintiffs did not assume any of Defendants' obligations and do not have any obligations to perform any of Defendants' obligations. In other words, Defendants continued to remain responsible for satisfying any warranties that its customers purchased. Defendants' refusal to do so represents yet another breach of the MRA.

## IV.
## CAUSES OF ACTION

### A. *Breach of Contract.*

42. Plaintiffs hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

43. The parties entered into valid and enforceable contracts, namely the MRAs. Defendants materially breached the MRA by (i) failing to remit amounts Defendants received that were required to be remitted to Agora (e.g., Sections 2.1, 2.6 and 5.1); (ii) representing that all of the vehicles contemplated by the MRAs had certificates of title that identified CNAC or Agora as

the First Lienholder (Section 4.2); (iii) failing to pay for the receivables that CNAC re-purchased; and (iv) failing to honor warranties on vehicles that Defendants' customers purchased (e.g., Sections 2.3 and 6.6).

44. As a proximate and foreseeable result of Defendants' breaches of the MRAs, Plaintiffs have been damaged in an amount that exceeds the jurisdictional limits of this Court. Specifically, Plaintiffs have been damaged in the amount of (i) $160,406.31 as a result of Defendants' failure to remit all amounts they received for the vehicles contemplated by the MRAs; (ii) $168,157.19 as a result of Defendants' failure to deliver the contracted-for titles; and (iii) $154,480.30 as a result of Defendants' failure to pay for the receivables they re-purchased. Plaintiffs seeks these amounts, as actual damages, plus any other special and consequential damages it has sustained, plus pre- and post-judgment interest at the highest rate allowed by applicable law.

45. Additionally and/or in the alternative, with respect to the certificates of title, Plaintiffs request that the Court order specific performance and require Defendants to deliver the certificates of title that Defendants represented would be delivered in the MRAs.

### B. *Breach of the Personal Guaranty.*

46. Plaintiffs hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

47. On or about September 30, 2022, Domaleski executed a Limited Personal Guaranty ("Personal Guaranty") absolutely, irrevocably, and unconditionally guaranteeing certain of Defendants' MRA obligations. A copy of the Personal Guaranty is attached to the MRA as Exhibit "I."

48. Plaintiffs are the owners and holders of the Personal Guaranty.

49. Domaleski breached the Personal Guaranty by failing to satisfy all of Defendants' MRA obligations which are referenced in the Personal Guaranty and which were owed to Plaintiffs.

50. As a result of Domaleski's breach, Plaintiffs have been damaged and seek to hold Domaleski liable under the terms of the MRA and the Personal Guaranty.

### C.     *Declaratory Judgment.*

51. Plaintiffs hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

52. Sections 2.3 and 6.6 of the MRA expressly state that Plaintiffs are not responsible for satisfying any obligation that Defendants owe to their customers, including any warranties that Defendants provided to their customers. Despite this, on information and belief, Defendants have refused to honor their customers' warranties and have instead directed their customers to seek relief from Plaintiffs' and/or Plaintiffs' servicer, Westlake. Thus, there is an actual controversy between Plaintiffs and Defendants concerning whether Defendants have an obligation to continue to satisfy their customers' warranties.

53. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaration that (i) Plaintiffs do not have an obligation to satisfy any customers warranties; and (ii) Defendants have the obligation to continue to honor the warranties they provided to their customers whenever they sold the vehicles to their customers.

### D.     *Attorneys' Fees.*

54. Plaintiffs hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

55. As a consequence of Defendants' breach of the MRAs and Personal Guaranty, Plaintiffs have been forced to retain the law firm of Kelly Hart & Hallman LLP to prosecute its claims in this lawsuit. Plaintiffs are, therefore, entitled to recover the reasonable and necessary incurred in prosecuting the claims asserted in this lawsuit. TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*

## V.
## APPLICATION FOR TEMPORARY INJUNCTION

56. Here, Plaintiffs seek injunctive relief concerning the contracted-for certificates of titles that Defendants have failed to convey or deliver, as well as Defendants' failure to honor the warranties they provided to their customers.

57. Federal Rule of Civil Procedure 65 authorizes this Court to issue a temporary injunction. To obtain an injunction, the moving party must show "(1) substantial likelihood of success on the merits; (2) irreparable injury; (3) a favorable balance of hardships; and (4) no adverse effect on the public interest." *Heil Trailer Int'l Co v. Kula*, 542 F. App'x 329, 331 (5th Cir. 2013). For the reasons stated herein, Plaintiffs maintain that they can meet each element required to obtain injunctive relief and that injunctive relief should issue.

### A.   *There is a Substantial Likelihood of Success on the Merits.*

58. The first requirement for the issuance of injunctive relief is that the movant must show that it has a substantial likelihood of prevailing on the merits of the claims that have been asserted. *Propath Servs., LLP v. Ameripath, Inc.*, No. 3:04-cv-1912-P, 2004 WL 2389214, at *2 n.9 (N.D. Tex. Oct. 21, 2004). An injunction-movant, however, need not prove that it will ultimately prevail on the merits of its claims. *Id.*

59. Here, there is a substantial likelihood that Plaintiffs will prevail on their claims regarding the contracted-for certificates of title. Specifically, in Section 4.2 of the MRA, Defendants represented that they had certificates of title for all of the at-issue vehicles and that such certificates identified CNAC or Agora as the "First Lienholder." Despite this representation, Defendants failed to deliver certificates of title for all of the at-issue vehicles that identified CNAC or Agora as the First Lienholder. The same easily satisfies the first requirement for the issuance of injunctive relief.

60. There is also a substantial likelihood that Plaintiffs will prevail on their declaratory judgment claim. Sections 2.3 and 6.6 expressly state that Plaintiffs did not assume any of Defendants' obligations, which would have necessarily included the obligation to honor the warranties they provided to the customers who purchased the at-issue vehicles. Despite this, on information and belief, Defendants have refused to honor their obligations and have instead referred their customers to Plaintiffs (or Plaintiffs' servicer, Westlake) to honor the warranties. Given the MRA's express language, there is a substantial likelihood that Plaintiffs will prevail on their declaratory judgment claim. Injunctive relief should issue for that reason too.

### B.    *Plaintiffs Will Sustain Irreparable Harm if Injunctive Relief Does Not Issue.*

61. The second requirement for injunctive relief is that the movant will sustain irreparable harm if injunctive relief does not issue. *Philadelphia Indem. Ins. Co. v. RKM Util. Servs., Inc.*, No. 4:19-cv-676, 2020 WL 2541961, at *3-*4 (E.D. Tex. May 19, 2020). "Harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* "[T]he mere fact that economic damages may be available does not always mean that a remedy at law is adequate." *Id.* The loss of a contractual right may be sufficient to satisfy this requirement. *Id.* (finding injunctive relief appropriate where plaintiff's claim was to enforce collateral security

rights). Additionally, Texas law is clear that loss of goodwill and business opportunities satisfy this requirement. *See, e.g.*, *Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied).

62. Here, Plaintiffs will suffer irreparable harm if injunctive relief does not issue with respect to the certificates of title. That is, if injunctive relief does not issue, Plaintiffs will not be able to exercise their contracted-for rights to foreclose on a vehicle if a customer defaults on a RIC. Put differently, without a perfected certificate of title, Plaintiffs will not be able to foreclose on a vehicle and repossess it in the event a customer stops making payments under a RIC. As a result, Plaintiffs will be left without a remedy that they anticipated having and, in fact, contracted for whenever they entered into the MRA. Injunctive relief should issue for that reason alone. Those facts notwithstanding, Defendants' actions have likely left their customers in a bind too. Because Defendants have not prepared, obtained and/or perfected the certificates of title, Defendants' customers are left with limited rights; indeed, they cannot even sell their vehicles.

63. Plaintiffs will also suffer irreparable harm if injunctive relief is not awarded in connection with their warranty claim. Specifically, if Defendants refuse to honor the warranties they promised to their customers, it is more likely that the customers will stop making payments under the RICs in the event that they have issues with their respective vehicles. That is, a customer is more likely to default on a RIC if it has problems with its vehicle and is not able to obtain the repairs contemplated by the respective warranties. This issue is further exacerbated by Defendants' failure to provide all of the contracted-for titles. If a customer defaults on a RIC because it cannot obtain repairs covered by the warranty and Plaintiffs do not have a perfected certificate of title, they will be the ones to suffer the loss and have no remedy that they can enforce. Injunctive relief should be granted for that reason also.

### C.     The Balance of Hardships Weighs in Plaintiffs' Favor.

64.     In determining whether to award injunctive relief, "courts must [also] balance the competing claims of injury and must consider the effect on each party of granting or withholding of the requested relief." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008). Here, the balance of hardships weighs in Plaintiffs' favor. This is because, as explained *supra*, Plaintiffs will suffer an extreme harm if injunctive relief does not issue. Defendants, on the other hand, will not sustain any real hardship if the Court entered an injunction. Instead, Defendants would simply be put in the position that they would have been in had they performed under the MRA. Thus, Defendants would not sustain any real hardship if the Court entered an injunction.

### D.     The Public Interest Supports Enforcing the MRA.

65.     It is well-settled that it serves the public interest to require parties who freely enter into contracts with one another to comply with their agreements and obtain the benefit of the bargain that they struck. *See, e.g., Compass Bank v. Owens*, No. DR-CV-040-AML/DGG, 2009 WL 10669017, at *7 (W.D. Tex. July 8, 2009); *see also Philadelphia*, 2020 WL 2541961, at *4 ("The issuance of a preliminary injunction in circumstances such as these serves the public interest by ensuring parties to indemnity agreements that they can count on enforcement of the terms that they bargained for."). Here, the requested injunctive relief simply puts the parties in the place they would have been in had Defendants performed under the MRA. The public interest is advanced by ensuring that parties to contracts, like Defendants, perform their contractual obligations. *See id.* An injunction is warranted for that reason as well.

### E.     Injunctive Relief Sought.

66.     Because Plaintiffs can establish each requirement for the issuance of a preliminary injunction, Plaintiffs respectfully request that the Court enter an injunction which:

      i. Requires Defendants to deliver and/or convey the contracted-for perfected certificates of titles for the at-issue vehicles;

      ii. Requires Defendants to honor the warranties they promised to their customers whenever Defendants sold the at-issue vehicles; and

      iii. Prohibits Defendants from directing their customers to Plaintiffs (or their servicer, Westlake) for satisfaction of the warranties.

## VI.
## PRAYER FOR RELIEF

For the above-stated reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer herein, and that upon a final trial on the merits of this lawsuit, Plaintiffs have and recover the following:

a) Actual, special and consequential damages;

b) A declaration that (i) Plaintiffs do not have an obligation to satisfy any customers' warranties; and (ii) Defendants have the obligation to continue to honor the warranties they provided to their customers whenever they sold the vehicles to their customers;

c) A temporary injunction that (i) orders Defendants to deliver the contracted-for certificates of title; (ii) prohibits Defendants from directing their customers to look to Plaintiffs to honor the customers' warranties; and (iii) requires Defendants to honor the warranties they provided to their customers whenever they sold the at-issue vehicles.

d) Reasonable and necessary attorneys' fees;

e) Specific performance in the form of the delivery of the certificates of title as referenced herein;

f) Pre- and post-judgment interest at the highest rate allowed by applicable law;

g) Costs of Court; and

h) Such other and further relief, whether at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

*/s/ Hugh G. Connor II*
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Caleb B. Bulls
State Bar No. 24082749
caleb.bulls@kellyhart.com
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Facsimile: (817) 878-9280

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

On November 7, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the following counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Randall W. Miller
rwmiller@munsch.com
Toni L. Anderson
tanderson@munsch.com
Emily Means
emeans@munsch.com
**MUNSCH HARDT KOPF & HARR, P.C.**
500 North Akard Street, Suite 4000
Dallas, Texas 75201

*Attorneys for Defendants*

*/s/ Hugh G. Connor II*
Hugh G. Connor II